MARGARETTA. The (CORNELL v.). See Case No. 3,239.

MARGARET YATES, The (UNITED STATES v.). See Case No. 15,720.

## Case No. 9,073.

### The MARIA.

[Blatchf. Pr. Cas. 283.] [1]

District Court, S. D. New York. Dec. 23, 1862.

PRIZE—ENEMY PROPERTY — CLAIM BY NEUTRAL—CLANDESTINE VOYAGE—BLOCKADE—FALSE PAPERS—LOG-BOOK.

No legal transfer of the vessel shown from her enemy owner to her neutral claimant. She came out of the blockaded port clandestinely, on the voyage next preceding the one on which she was captured. She knowingly attempted to violate the blockade. Her papers were false as to her destination. Her log-book was mutilated and altered. Vessel and cargo condemned.

[See The Albert, Case No. 138.]

In admiralty.

BETTS, District Judge. Many of the matters connected with this vessel and her cargo and voyage, and the prosecution and defence of this suit, are strikingly coincident with those occurring and considered in the case of U. S. v. The Albert and Cargo [Case No. 138]; and the proofs in the one case have in several respects been reciprocally invoked into the other, and made part of its proceedings. The Maria was Charleston built, and proceeded from that port to Matanzas, in March, 1862, with a cargo of cotton. She took in a cargo at Matanzas and Nassau for New York, and a charter agreement was entered into between William Smith, her owner, and Messrs. Monet, Jemenez & Co., merchants at Matanzas, March 26, 1862, to add to and complete her cargo at the Bahama Islands, for the port of New York. The cargo consisted chiefly of salt, especially adapted to the Charleston market. There was also a quantity of cotton cards, shipped by R. L. Sanchez. A provisional register of the vessel was taken out in the name of William Smith, at Nassau, New Providence, April 16, 1862. A crew-list was executed by the master. at Matanzas, March 20, and by the mate and men, at Nassau, April 16 and 19, 1862, for a voyage to New York, and back to the port of Nassau. All the cargo was shipped in the name of Charleston hirers, except one shipment by R. L. Sanchez. The vessel cleared at Nassau April 16, but the destination of the cargo was not named. The log described her departure from Nassau, Sunday, April 20, 1862, towards New York, and her arrest by the United States steamer Santiago de Cuba, at 1 p. m. on the 1st of May. It is alleged in the libel that this seizure was made at sea. near the South Carolina coast, on or about the 30th of April. The master, intervening in the suit, and claiming and answering for the owner, admits the allegation in the libel to be correct, and as the log contains no other entry after the close of the last day of April than the mention of the capture, that undoubtedly occurred at sea-time, 1 a. m. instead of 1 p. m.

---

[1] [Reported by Samuel Blatchford, Esq.]

Monet, Jemenez & Co., intervene and claim a part of the cargo, 800 bags of salt and two cases of cigars. Rafael L. Sanchez claims forty boxes, containing eighty dozen of cards for cleaning cotton, as shipped at Matanzas for New York, to touch at Nassau. The names of Monet, Jemenez & Co., printed in the bill of lading, signed by the master at Matanzas March 26, 1862, as shippers of the goods, are erased in the bill found on board, and the name of R. L. Sanchez is inserted in the place, as shipper. Francisco Otero & Co., merchants, of Matanzas, were charterers of the vessel, and were to be her consignees at Nassau and New York. The bill of lading directs the consignees named therein to pay freight on their consignments to Messrs. F. Otero & Co., the charterers.

The facts, established by direct proof or strong presumption, were claimed by the libellants to be: 1. That the schooner, being enemy property, went, on the voyage directly preceding the one on which she was captured, with a cargo, from Charleston to Matanzas, and in violation of the blockade of the former port. 2. That her owner colorably attempted, at Matanzas, to change her title to a neutral ownership, but that the vessel remained, in law, enemy property. 3. That at Matanzas and Nassau she took on board cargo destined for Charleston or a blockaded port, and attempted, with such cargo, to enter a blockaded port. 4. That her papers, and the presentation of her voyage, were intentionally simulated and false. 5. That her log was culpably mutilated, and also contained false entries, intended to mislead belligerent cruisers. 6. That the voyage was fitted out and prosecuted with full knowledge of the existence of the war and of the blockade of the Southern ports of the United States, with a design to evade the blockade.

The claimants of the vessel and cargo contest these positions in pleading and on trial, and maintain that the voyage was honest and lawful in all particulars, and that the approach of the vessel, out of her true course, towards a blockaded port, was compelled by stress of weather and injury to the vessel therefrom, and a want of water. These various propositions have been subjects of such repeated consideration in this court for many months past, that all labored discussion of the points at this time will be unnecessary to disclose their legal bearing in the cause. The decisions in regard to them will remain the law governing the action of this court until changed by the judgment of the higher tribunals, and the attention of the court will be limited to ascertain the conclusions justly deducible from the proofs given in the cause.

The master and mate of the vessel, and Monet, a passenger on board, differ somewhat as to the time and place of the capture of the vessel. The master says it was about the 30th of April, 1862, near 12 o'clock, in latitude 30° and some minutes north, and longitude 84° 4' 30" west, but he rather thinks that the longitude was 80° 4' 30" west, and presumes the latter is the reckoning by the mate in the logbook. The mate testifies that the capture was on the 1st of May, twenty or thirty miles off the coast of South Carolina; and the passenger, Monet, states the time of capture to have been Wednesday, April 30, eighteen or twenty miles off land, and in the vicinity of Charleston. The entry in the log is that the prize was hailed by the capturing vessel May 1, at one p. m., and the computation of her position at the close of April 30 is entered at latitude 32° 7' north, longitude 80° 44½' west. The statement of this matter by the master is of no great moment, other than as showing that his verbal representation of facts connected with the voyage is to be accepted with caution. For instance, it is palpable that if the vessel was, when seized, at either point of latitude or longitude adopted by the master in his evidence, she would have been widely clear of any existing attempt to evade the blockade of Charleston or of the coast of South Carolina. The master says that he heard from Smith that he purchased the vessel at Matanzas from an agent of her American owner, and received a bill of sale, but the witness never saw any bill of sale, and does not know its contents.

The master had known, for ten months, of the war and the blockade of Charleston. These facts were publicly notorious on board. The master imputed her position out of the due route to New York to violent weather, and damages to the vessel, and loss of water on board, incurred after her departure from Nassau. He says he was not steering for any particular port, but was endeavoring to make the blockading squadron, to obtain a supply of water; that the course of the vessel was altered April 27, to endeavor to fall in with the blockading squadron to obtain water; that on the 22d or 23d of that month she had experienced a gale and shipped large quantities of water, and had two water casks stove in and lost all the water they contained; and that when the vessel left Nassau she had four casks of water. The original and natural entries in the log respecting the state of the weather on the 22d and 23d days of April are these: "22d, p. m. begins with fresh breezes, with rain, squally; 3 p. m. double-reefed the main and single-reefed the foresail, took in the flying jib; 5 p. m., tacked to the S. W.; 6 p. m. set the flying jib; 11 p. m. took in flying jib and tacked to N. W." Then follow in lighter ink and more constrained formation of the words: "Shipped several heavy seas, and stove the head in water-casks." After that paragraph is written, in the same hand and ink as the first entry, "M., fresh breezes." This supplies a forcible presumption that the paragraph in regard to water-casks was interpolated in the entry at an after day, to support the excuse set up on the seizure of the vessel, that she was seeking relief because of sea damages and the loss of water. Neither the mate nor

the passenger, in their testimony, supports the statements of the log, or the evidence of the master in this respect, on his examination in preparatorio. Another flagrant inconsistency in the master's evidence under the 12th and 24th interrogatories forcibly impairs his title to credit as a witness.

Upon the facts and law of the case, the libellants have, in my judgment, established the culpability of this voyage. The claimants fail to show a legal transfer of the vessel from her enemy owner to the neutral claimant. She came out of a blockaded port clandestinely on the voyage next preceding this on which she was captured. She was hired, freighted, and despatched on this voyage with full knowledge of the existence of the war and of the blockade of Charleston and the Confederate ports. She was destined for Charleston or a blockaded port in that vicinity, and an attempt to make such unlawful voyage was made and persisted in, in her navigation, to the time of her capture. The papers of the ship, setting forth the destination of the voyage, were intentionally falsified. The log was unlawfully mutilated, and falsely changed and varied in important entries. The condemnation and forfeiture of the vessel and cargo are decreed.